MEGHANN A. TRIPLETT (SBN 268005)
*Meghann@MarguliesFaithLaw.com*
SAMUEL M. BOYAMIAN (SBN 316877)
*Samuel@MarguliesFaithLaw.com*
**MARGULIES FAITH, LLP**
16030 Ventura Blvd., Suite 470
Encino California 91436
Telephone: (818) 705-2777
Facsimile: (818) 705-3777

Attorney for Jeremy W. Faith, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re<br><br>CHARLES L. DUFF,<br><br>               Debtor. | Case No.: 9:18-bk-11889-DS<br><br>Chapter: 7<br><br>**CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF ORDER: (1) AUTHORIZING THE SALE OF REAL PROPERTY LOCATED AT 2690 GIBRALTAR ROAD, SANTA BARBARA, CA 93105, FREE AND CLEAR OF LIENS AND INTERESTS; (2) APPROVING OVERBID PROCEDURES; (3) APPROVING PURCHASER, SUCCESSFUL BIDDER, AND BACK-UP BIDDER AS GOOD FAITH PURCHASERS; (4) AUTHORIZING PAYMENT OF UNDISPUTED LIENS, REAL ESTATE BROKER'S COMMISSION, AND ORDINARY COSTS OF SALE; AND (5) WAIVING THE 14 DAY STAY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT**<br><br>Hearing:<br>Date:   December 6, 2022<br>Time:   11:30 a.m.<br>Place:  Courtroom 201<br>          1415 State Street<br>          Santa Barbara, CA 93101 |

**TABLE OF CONTENTS** **Page**

I.    **INTRODUCTION** ...................................................................................................1

II.   **STATEMENT OF FACTS** ....................................................................................2

    A.    **The Bankruptcy Case** .................................................................................2

    B.    **The Debtor's Prior Marketing Efforts** ......................................................3

    C.    **Employment of the Trustee's Broker and Marketing Efforts**.............5

    D.    **Proposed Sale** ............................................................................................7

    E.    **Liens, Claims and Interests** ......................................................................8

    F.    **Subordination Agreement with the SBA Permitting Sale of the Property** ......9

    G.    **The Broker's Commission and Estimated Net Proceeds to the Estate** .........11

    H.    **Proposed Overbid Procedures** ...............................................................12

    I.    **Notice to Creditors**...................................................................................15

III.   **ARGUMENT**.......................................................................................................15

    A.    **The Proposed Sale is in the Best Interest of the Estate** ...................15

    B.    **The Court Should Approve the Sale Free and Clear of Liens, Interests and Encumbrances** ........................................................................................16

    C.    **The Sale was Negotiated in Good Faith**.............................................19

    D.    **The Waiver of the Stay is Appropriate** ...............................................20

IV.   **CONCLUSION** ...................................................................................................21

**DECLARATION OF JEREMY W. FAITH** .................................................................23

i

# TABLE OF AUTHORITIES

## CASES                                                                     Page

Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot),
    94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) ................................................ 16, 19

Citicorp Mortgage v. Brooks (In re Ex-Cel Concrete Co.),
    178 B.R. 198, 203 n.7 (9th Cir. BAP 1995) ................................................ 19

In re 240 North Brand Partners, Ltd.,
    200 B.R. 653 (B.A.P. 9th Cir. 1996) ................................................ 15

In re Abbotts Dairies of Pennsylvania, Inc.,
    788 F.2d 143, 147 (3rd Cir. 1986) ................................................ 20

In re America West Airlines,
    166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ................................................ 15

In re Ernst Home Center, Inc.,
    209 B.R. 974 (Bankr. W.D. Wash. 1997) ................................................ 15

In re Ewell,
    958 F.2d 276, 281 (9th Cir. 1992) ................................................ 20

In re Gerwer,
    898 f.2d 730, 733 (9th Cir. 1990) ................................................ 16

In re Haven Eldercare,
    390 B.R. 762, 771 (Bankr. D. Conn. 2008) ................................................ 19

In re Lionel Corp.,
    722 F.2d 1063, 1071 (2d Cir. 1983) ................................................ 15

In re Pine Coast Enterprise, Ltd.,
    147 B.R. 30, 33 (Bankr. N.D. Ill. 1992) ................................................ 19

In re Wilde Horse Enterprises, Inc.,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ................................................ 15

## STATUTES                                                                  Page

11 U.S.C. § 327 ................................................ 5, 11

11 U.S.C. § 328 ................................................ 5, 11

11 U.S.C. § 363(b) ................................................ 1, 15, 21

11 U.S.C. § 363(f) ................................................ 1, 16

11 U.S.C. § 363(f)(2) ................................................ 18, 19

11 U.S.C. § 363(f)(3) ................................................ 17, 18

ii

11 U.S.C. § 363(f)(4) ..................................................................... 10, 17, 18, 21

11 U.S.C. § 363(m) ....................................................................... 1, 19, 20, 22

11 U.S.C. § 510(c)(1) ............................................................................... 10

11 U.S.C. § 510(c)(2) ............................................................................... 10

11 U.S.C. § 702 ......................................................................................... 2

11 U.S.C. § 704(a)(1) ............................................................................... 15

**RULES**                                                                    **Page**

Federal Rule of Bankruptcy Procedure 2002(a)(2) ..................................... 15

Federal Rule of Bankruptcy Procedure 6004(a) .................................... 1, 15

Federal Rule of Bankruptcy Procedure 6004(g) ......................................... 20

Federal Rule of Bankruptcy Procedure 6004(h) .................................... 1, 20

Federal Rule of Bankruptcy Procedure 6006(d) .................................... 1, 20

Federal Rule of Bankruptcy Procedure 9019 ............................................. 10

**TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL OTHER INTERESTED PARTIES:**

Jeremy W. Faith, Chapter 7 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Charles L. Duff (the "Debtor"), files this motion pursuant to 11 U.S.C. § 363(b), (f) and (m), and Rule 6004(a) of the Federal Rules of Bankruptcy Procedure ("F.R.B.P.") for an order: (1) authorizing the Trustee to sell the Estate's right, title, and interest in real property, free and clear of all liens, claims, and interests pursuant to 11 U.S.C. § 363(b) and (f); (2) approving the overbidding procedures set forth in this motion; (3) finding that the purchaser, and if applicable, the successful overbidder, and back-up bidder are good faith purchasers pursuant to 11 U.S.C. § 363(m); (4) authorizing the payment of undisputed liens, the real estate broker's commission, and ordinary costs of sale; and (5) waiving the 14-day stay prescribed by F.R.B.P. 6004(h) and 6006(d) (the "Motion").

In support of this Motion, the Trustee submits the following memorandum of points and authorities, the declarations of Jeremy W. Faith ("Faith Dec."), Stan Tabler ("Tabler Dec."), Gary R. L'Hommedieu and Caitlin K. L'Hommedieu (together the "Purchaser Decs."), the other pleadings and orders already on file in this case, and on such other argument and evidence as may be presented at the time of the hearing.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.**

<u>**INTRODUCTION**</u>

This Motion is brought to authorize the sale of the real property commonly known as 2690 Gibraltar Road, Santa Barbara, California 93105 (the "2690 Property") to the Gary R. L'Hommedieu and Caitlin K. L'Hommedieu Trust or its assignee ("Purchaser") or to any winning overbidder at the time of the sale (the "Sale"). The Trustee has marketed the 2690 Property and received a purchase offer of $2,395,000 (the "Purchase Price"). The Trustee believes that this amount is fair market value. A

1  true and correct copy of the binding Counter-Offer between the Trustee and the

2  Purchaser (referred to herein as the "Purchase Agreement") is attached as **Exhibit 1**.

3  The Trustee seeks to sell the 2690 Property free and clear of all liens, claims and

4  interests.  The Trustee also requests (i) approval of the Purchaser, successful bidder

5  and one or more back-up bidders, as good-faith purchasers, (ii) approval of proposed

6  overbid procedures, (iii) approval to pay all undisputed liens, outstanding real property

7  taxes, the broker's commission, and other costs of sale, (iv) and (v) waiver of any stay

8  of the order granting this Motion.

9       The Trustee has determined in his business judgment that the proposed sale is

10 reasonable and in the best interests of the Estate because the sale will maximize the

11 value of the 2690 Property.  As further detailed below, the Trustee has entered into an

12 agreement with the U.S. Small Business Administration (the "SBA") for a partial

13 subordination of the SBA's cross-collateralized lien against the Debtor's three

14 Properties (defined *infra*), and as a result, anticipates the proposed sale will generate

15 $200,000 for the Estate after payment of, costs of sale including real estate

16 commissions, and undisputed secured liens from which distributions can be made to

17 creditors of the Estate.

18                                  **II.**

19                       **STATEMENT OF FACTS**

20        **A.  The Bankruptcy Case**

21       On November 12, 2018 (the "Petition Date"), the Debtor filed a voluntary petition

22 under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

23 "Bankruptcy Code") commencing the above-captioned bankruptcy case (the "Case").

24 The Case was converted to Chapter 7 by order of the court on July 20, 2022 (Dkt. No.

25 281).  The Trustee is the duly appointed and acting Chapter 7 trustee of the Debtor's

26 Estate under 11 U.S.C. § 702.

27       In his Schedule A/B, the Debtor included his ownership interest in the 2690

28 Property as well as his interest in the adjacent real property located at 2835 Gibraltar

1  Road, Santa Barbara, CA 93105 which is the Debtor's residence (the "2835 Property,"

2  and together with the 2690 Property, the "Santa Barbara Properties"), and a rental

3  property located at 1964 Cloverlawn Drive, Grants Pass, Oregon (the "Oregon

4  Property") (the Santa Barbara Properties and the Oregon Property are collectively

5  referred to as the "Properties") (Dkt. No. 34).  The Properties are community property

6  assets of the Debtor and his non-filing spouse Catheryn A. Duff ("Mrs. Duff," and

7  together with the Debtor, the "Duffs").

8      As part of his investigation in this Case, the Trustee consulted with his real

9  estate agents to independently value the Properties.  The Trustee also obtained

10  preliminary title reports and copies of the underlying deeds of trust for the respective

11  Properties to assess potential liens and encumbrances.  Following conversion of the

12  Case, the Trustee's real estate agent, Stan Tabler of Compass California inspected the

13  Santa Barbara Properties and informed the Trustee that the 2690 Property had a

14  market value of $2,010,000 and the 2835 Property had a market value of $3,100,000.

15  *See* Tabler Dec., ¶ 6.[1]

16      **B.  The Debtor's Prior Marketing Efforts**

17      The Santa Barbara Properties have been continuously on the market since

18  September 9, 2003, just over nineteen (19) years, with at least twenty (20) different

19  brokerage companies. *See* Tabler Dec., ¶ 7.  During the approximate four-year period

20  the Case was in a Chapter 11, the Debtor, in his capacity as a debtor-in-possession,

21  sought to sell the Santa Barbara Properties through three different brokerage firms and

22  their respective listing agents.  The Debtor originally employed Shervin Rafii of

23  Berkshire Hathaway Home Services ("Berkshire") to market and sell the Santa Barbara

24  Properties with a listing price of $2,950,000 for the 2690 Property and a listing price of

25

26  ─────────────────

[1] The Trustee is concurrently filing a motion for approval of the sale of the 2835

27  Property.  The Trustee anticipates filing a motion to employ a real estate broker to
market and sell the Oregon Property with a listing price of $425,000 prior to the hearing

28  on the Motion.

1   $3,995,000 for the 2835 Property effective January 24, 2019, which application was

2   approved by the court on May 8, 2019 (Dkt. Nos. 59, 89).  After several extension of

3   the Berkshire listing agreement, the Debtor replaced Berkshire with Bayside Properties

4   through its agent Vic R. Domines ("Bayside") to market and sell the Santa Barbara

5   Properties with a listing price of $2,895,000 for the 2690 Property and a listing price of

6   $3,695,000 for the 2835 Property, effective as of October 26, 2019 (Dkt. No. 162).

7          The court approved the Debtor's application to employ Bayside as his new real

8   estate broker on December 19, 2019. (Dkt. No. 172).  The Debtor continued to market

9   the Santa Barbara Properties with Bayside and extended Bayside's listing agreement

10  several times.  After the expiration of the extended listing agreement with Bayside the

11  Debtor sought to employ Pehr Black of EXP Realty ("EXP") as his third replacement

12  broker to sell the Santa Barbra Properties with a listing price of $2,995,000 for the 2690

13  Property and a listing price of $3,695,000 for the 2835 Property, effective as of October

14  19, 2021 (Dkt. No. 237).  The court entered an order approving the EXP's employment

15  on November 18, 2021 (Dkt. No. 245).

16         On October 18, 2021, Debtor filed a *Motion for Order Authorizing the Sale of the*

17  *2690 Gibraltar Property and the 2385 Gibraltar Property* (the "First Sale Motion*,*" Dkt

18  No. 231) seeking approval of a combined sale of the Santa Barbara Properties with a

19  proposed sale price of $2,995,000 for the 2690 Property and of $3,695,000 for 2835

20  Gibraltar.  After several continuances, the proposed buyer who was a friend of the

21  Debtor, backed out of the deal and the court entered an order denying the First Sale

22  Motion on January 25, 2022 (Dkt. No. 256).

23         In or about March 2022, in the Debtor advised the court that the driveway of

24  2690 Property no longer met current Fire Code requirements (Dkt. No. 262. The Debtor

25  subsequently appealed the matter to the Board of Directors of the Montecito Fire

26  Protection District and lost (Dkt. No. 266).  The Debtor continued to market the Santa

27  Barbra properties for several more months until the Case was converted to Chapter 7

28  on July 20, 2022 (Dkt. No. 281).  The Debtor continued to market the Santa Barbra

1  properties for several more months until the Case was converted to Chapter 7 on July

2  20, 2022 (Dkt. No. 281).

3        In sum, the Debtor marketed the Santa Barbara properties for an extended

4  period both pre-petition and during the approximate four-year period the Case was in

5  chapter 11 and failed to sell either of the Santa Barbara Properties.  The Debtor also

6  made no effort to sell the Oregon Property.  Apart from paying the real property taxes,

7  the Debtor has not paid any of the secured debt on the Santa Barbara Properties for

8  more than four years, which in combination with a drop in the real estate market has

9  substantially decreased the available equity in the Santa Barbara Properties.[2]  Finally,

10  following conversion of the Case, the Debtor ceased paying the insurance on the

11  Properties, the Trustee obtained replacement insurance on the Properties effective

12  October 1, 2022 which he has kept in place at an aggregate cost to the Estate of

13  $6,707.99 per month.  *See* Faith Dec. ¶ 9.

14        **C. Employment of the Trustee's Broker and Marketing Efforts**

15        On September 29, 2022, the Trustee filed an application to employ Coldwell

16  Banker Realty and Compass California as his real estate broker (the "Broker") and

17  enter into *Exclusive Listing Agreement* effective August 30, 2022 to market and sell the

18  Santa Barbara Properties (the "Broker Application," Dkt. No. 313).  On October 18,

19  2022, the court entered an order approving the Broker's employment on the terms and

20  conditions set forth in the Broker Application pursuant to 11 U.S.C. §§ 327 and 328

21  (Dkt. No. 320).

22        In light of the extensive marketing history of the Santa Barbra Properties, as an

23  initial step, the Trustee contacted the Debtor's former real estate agent Pehr Black of

24  EXP Realty in early August 2022, and worked with his real estate agents and counsel

25

26  [2] For example, Shellpoint's asserted first position lien on the 2690 Property has
   increased by almost $260,000, from $1,577,821.16 as reflected in Shellpoint's proof of
27  claim no. 8 filed on February 27, 2019, to $1,836,188.18 as of September 13, 2022,
   with interest continuing to accrue on the loan at a per diem rate of $103.480/day
28  pursuant to a payoff demand obtained by the Trustee.

1    to obtain additional information regarding the Debtor's marketing efforts and the contact

2    information for potential buyers who had expressed interest and/or had previously

3    written offers for the Santa Barbara Properties during the pendency of the Chapter 11.[3]

4    The Trustee's agents thereafter contacted each of these prospective buyers to inquire if

5    they had any renewed interest in purchasing the Santa Barbara Properties and

6    received three new offers for the 2690 Property.  These offers ranged from $1,800,000

7    to $2,100,000.  In response, the Trustee issued three counteroffers to solicit each of

8    the potential buyer's highest and best offer for the 2690 Property.  The Trustee

9    originally accepted an offer of $2,000,000 for the 2690 Property.  However, the

10   prospective buyer withdrew prior to the expiration of the contingency period and the

11   sale did not materialize.

12         The Trustee's Broker re-listed the 2690 Property for sale in the MLS on

13   September 10, 2022, with multiple HD photos of the interior and exterior of the 2690

14   Property as well as floorplan details, and created a virtual tour video, for an original

15   listing price of $2,100,000.  These efforts resulted in three new interested buyers who

16   wrote offers to the Trustee, two of which were non-contingent offers.  These efforts

17   ultimately led to the Trustee accepting the current noncontingent cash offer from the

18   Purchaser.  Moreover, following entry of the order approving the Broker Application, the

19   Broker agreed to reduce its commission to an aggregate of four and one-half (4.5%) of

20   the total sales price of each of the Santa Barbara Properties and updated the MLS to

21   reflect the reduction (the "Commission Reduction").  A copy of the escrow instruction

22   providing for the Commission Reduction of the 2690 Property is attached as **Exhibit 3**.[4]

23

24

_____

25   [3] The Trustee also instructed EXP to remove the Debtor's listing of the Santa Barbara
     Properties from the California Regional Multiple Listing Service (the "MLS").

26   [4] To achieve the Commission Reduction for the 2690 Property, it was agreed that the
     Purchaser's Broker reduce his commission to 2.4% and the Trustee's Broker reduce

27   their portion of the commission to 2.1% for a total aggregate brokerage commission
     equal to 4.5% of the gross sales price. The same terms shall apply to the broker of any

28   Successful Bidder or Back-Up-Buyer.

1        The Broker has consistently advertised the 2690 Property on the MLS, the

2   online and syndicated sites of Compass California and Coldwell Banker's respective

3   listing agent sites, as well as Homesnap; Homes.com; ListHub; Realtor.com;

4   Redfin.com; Zillow.com and has held multiple showings, fielded numerous inquiries

5   regarding the 2690 Property in addition to actively reaching out to parties who had

6   previously expressed interest in purchasing the 2690 Property.  The Broker also

7   completed an online/digital campaign which includes social media exposure on

8   Facebook and Instagram and sponsored advertising as well as a full-page ad in the

9   local Santa Barbara Independent newspaper.  The Broker has taken all steps feasible

10  at this time to ensure the proper marketing of the 2690 Property to interested parties.

11  The Broker will continue to actively market the 2690 Property to encourage overbidders

12  until the sale hearing.  Finally, concurrently with the filing of this Motion, the Trustee's

13  Broker will update the MLS listing, to include the overbid procedures and hearing date

14  for the Motion to ensure that any parties interested in overbidding will be able to

15  participate.  The current offer from the Purchaser is the highest and best offer received

16  by the Trustee.

17       **D. <u>Proposed Sale</u>**

18       After consultation with his Broker and subject to overbid, the Trustee has

19  accepted the current highest and best offer of $2,395,00.00 (defined *supra* as the

20  "Purchase Price"), from the Purchaser.  The Purchaser provided the Trustee with proof

21  of funds and have paid an initial deposit of $71,850.00 (the "Deposit") into escrow

22  pursuant to the Purchase Agreement which escrow is holding subject to court approval

23  and closing of the sale. *See* **Exhibit 1**.  The Purchaser has waived all contingencies in

24  connection with the sale and the sale is scheduled to close within fourteen (14)

25  calendar days after entry of the court's order approving the sale (the "Sale Order").[5]

26

27  _____

28  [5] The Deposit shall be refunded to the Purchaser if the Trustee is unable to close the sale, or the Purchaser is not the approved overbidder.

The 2690 Property shall be delivered vacant at close of escrow and the Trustee is

informed that the Duffs will deliver possession of the Santa Barbara Properties on or

before December 1, 2022.  However, in the event the 2690 Property is not vacant by

the scheduled closing date, the Purchaser agreed to extend escrow until such time as

the 2690 Property becomes vacant.  The Trustee is providing marketable title to the

2690 Property. The sale is otherwise "as-is," "where-is," and without representations or

warranties of any kind and is not subject to any contingencies.

### E.  Liens, Claims, and Interests

According to the Preliminary Title Report obtained by the Trustee from First

American Title Company as of September 19, 2022 (the "Title Report"), a copy of which

is attached as **Exhibit 2**, the following liens have been recorded against the 2690

Property:

| Recording Date | Lienholder | Type of Encumbrance | Original Lien Amt. | Est. Current Lien Amount |
|---|---|---|---|---|
| n/a (Item 1) | property taxes | 1st ½ county taxes 2022-23 at $4,770.88/semi-annually from 11/18/2022 to 01/01/2023 | n/a | $1,139.71[6] |
| 1/27/2006 (Item 5) | Countrywide Home Loans, Inc. | Deed of Trust | $1,500,000 | $1,836,188.18[7] |
| 4/12/2012 | Shellpoint Mortgage, servicer for The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificateholders of CWALT, Inc., Alternative Loan Trust 2006-Hy3, Mortgage Passthrough Certificates, Series 2006-HY3 c/o Shellpoint Mortgage Company (defined *supra* as "Shellpoint") | Assignment | | |

---

[6] Amount obtained from escrow on November 2, 2022.
[7] On February 27, 2019, Shellpoint filed proof of claim no. 8, asserting a first position deed of trust in the secured amount of $1,557,821.16 (as of February 27, 2019).

| 1/27/2006 (Item 6) | Washington Mutual Bank, FA, a Federal Association (defined *supra* as "WAMU") | Deed of Trust | $225,000 ("WAMU Lien") | $0.00 (*disputed*) |
|---|---|---|---|---|
| 10/27/2006 (Item 7) | Countrywide Bank, N.A. | Deed of Trust | $150,000 | $167,650.00[8] |
| 7/08/2012 | The Bank of New York Mellon fka The Bank of New York, as Successor Trustee to JPMorgan Chase Bank, N.A., as Trustee on Behalf of the Certificateholders of the CWHEQ Inc., CWHEQ Revolving Home Equity Loan Trust, Series 2006-I c/o Specialized Loan Serving (defined *supra* as "Specialized") | Assignment | | |
| 7/27/2010 (Item 8) | The Administrator of the U.S. Small Business Administration, an Agency of the Government of the United States of America (defined *supra* as the "SBA") | Deed of Trust | $374,900.00 | $729,117.79[9] |

The Trustee is unaware of any other liens, claims, or interests being asserted against the 2690 Property.

### F. <u>Subordination Agreement with the SBA Permitting Sale of the Property</u>

The above-referenced liens of Shellpoint, Specialized, and the SBA are undisputed. The Trustee has received information from the Duffs that the WAMU Lien was paid in full when the Debtor refinanced with Countrywide Home Loans in 2006 and WAMU never removed its lien. The Trustee further believes that the WAMU Lien was only secured by the 2835 Property and the lien was improperly recorded against the 2690 Property. The Trustee seeks to sell the 2690 Property free and clear of the

---

[8] On August 11, 2022, Specialized filed a *Notice of Motion and Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362* (Dkt. No. 293) asserting a second position Deed of Trust in the secured amount of $161,468.41.
[9] On December 6, 2018, the SBA filed a proof of claim no 6, asserting a secured claim of $729,117.79 (the "SBA Claim"). The SBA Claim is cross-collateralized and is secured by each of the three Properties. The SBA asserts a third position deed of trust secured by the 2690 Property. *See* Proof of Claim No. 6.

1  WAMU Lien as a contested lien pursuant to 11 U.S.C. § 363(f)(4) and may file an

2  adversary proceeding to resolve the dispute.

3      The SBA Lien (referred to herein as the "SBA Claim") is cross-collateralized and

4  is secured by a deed of trust recorded against each of the Debtor's three Properties.

5  To induce the Trustee to proceed with the administration of the Estate and distribute

6  funds to creditors, the Trustee and the SBA have agreed to terms for a *Partial*

7  *Subordination Agreement and Limited Release* (the "Subordination Agreement")

8  regarding the sale of the three Properties, subject to court approval of the

9  Subordination Agreement and the underlying sales.  Among other things, the proposed

10  Subordination Agreement provides for the partial subordination and transfer of the

11  subordinated portion of the SBA Claim to the Trustee.  The Trustee anticipates filing

12  the *Motion for Order Approving Compromise of Controversy with the SBA* pursuant to

13  F.R.B.P. 9019 ("9019 Motion") and related notice for approval of the Subordination

14  Agreement within the next week.

15      The Subordination Agreement provides for $300,000 of the SBA Claim secured

16  by the three Properties ("Subordinated Portion") to be subordinated to the claims of the

17  Trustee, his professionals, and general unsecured creditors of the Debtors' Estate, with

18  the remainder retaining the same validity, priority, and extent that would otherwise exist

19  under California law, pursuant to 11 U.S.C. § 510(c)(1).  Further, pursuant to 11 U.S.C.

20  § 510(c)(2), the lien securing the Subordinated Portion of the SBA Claim shall be

21  transferred to the Estate with the Estate receiving all associated rights held by SBA as

22  to the subordinated portion of the SBA Claim.  The balance of the non-subordinated

23  portion of the SBA Claim will be retained by the SBA as an allowed secured claim.  The

24  balance of the SBA Claim not paid from the sale of the Properties, including the

25  Subordinated Portion, will be allowed as a general unsecured claim in the Case.

26      The Subordination Agreement provides for the SBA Claim to be distributed as

27  follows:

28      (a) The balance of the nonsubordinated portion of the SBA Claim will be
retained by the SBA as an allowed secured claim.  The balance of the

SBA Claim not paid from the sale of the Properties, including the Subordinated Portion, will be allowed as a general unsecured claim in the Bankruptcy Case;

(b) The SBA Claim against 2835 Gibraltar will be partially subordinated in an amount equal to: (i) all costs of sale, including commissions; and (ii) the remaining net sales proceeds after payment of all costs of sale, commissions, senior secured liens, including real property taxes shall be paid to the SBA by the Trustee through escrow towards the balance of the SBA Claim;

(c) The SBA Claim against 2690 Gibraltar will be partially subordinated in the amount equal to: (i) all costs of sale, including commissions; and (ii) the first $200,000 after payment of the liens senior to the SBA, including real property taxes shall be paid to the Estate through escrow; (iii) the remaining net sales proceeds after payment of (i) and (ii) shall be paid to the SBA by the Trustee through escrow towards the balance of the SBA Claim; and

(d) The SBA Claim against the Oregon Property will be partially subordinated in the amount equal to: (i) all costs of sale, including commissions; and (ii) the first $100,000 after payment of the liens senior to the SBA Claim including real property taxes shall be paid to the Estate through escrow; and (iii) the remaining net sales proceeds after payment of (i) and (ii) shall be paid to the SBA by the Trustee through escrow towards the balance of the SBA Claim.

Absent the Subordination Agreement with the SBA, there would be insufficient equity for the Trustee to administer the Properties.

### G. The Broker's Commission and Estimated Net Proceeds to the Estate

The Trustee proposes to pay 4.5% of the gross sales price in brokerage commissions and to pay all customary title, escrow, and closing costs through escrow.[10]  Assuming a purchase price of $2,3950,000, the amount of $107,775 will be paid in brokerage commissions.  The Trustee estimates closing costs will be approximately $47,900.  Finally, the Trustee has determined that there will be no taxes owed as a consequence of the Sale.  The Trustee seeks authority to distribute the sale

---

[10] The court approved the Trustee's Broker Application, along with the terms of compensation providing for a 5% commission of the gross sales price pursuant to 11 U.S.C. §§ 327 and 328 on October 18, 2022 (Dkt. No. 320).  However, at the request of the Trustee, the Brokers agreed to reduce the commission to 4.5%. *See* **Exhibit 3**.

proceeds in the amounts estimated below, based on an initial gross sale price of $2,395,000.00:

| Description | Amount |
|---|---|
| Property Taxes | ($1,139.71) |
| Shellpoint | ($1,836,188.18) |
| WAMU (disputed deed of trust) | $0.00 |
| Specialized | ($167,680.00) |
| Real Estate Commissions (4.5%) | ($107,775.00) |
| Costs of Sale (title, escrow, taxes, recording (2%) | ($47,900.00) |
| *Net to be split between the SBA and the Estate pursuant to Subordination Agreement* | $234,317.11 |
| -Estate's Portion | $200,000.00 |
| -SBA's Portion | $34,317.11 |

### H. Proposed Overbid Procedures

While the Trustee is prepared to consummate the sale with the Purchaser, he is also interested in obtaining the maximum price for the 2690 Property.  Therefore, the sale is subject to overbid and the Trustee seeks approval of the following overbid procedures:

1.    Unless the Trustee extends the time for bids to be submitted, by no later than 12:00 p.m. on December 5, 2022, any party wishing to present an overbid must deliver the following to the Trustee's counsel at the law office of Margulies Faith LLP, 16030 Ventura Blvd., Suite 470, Encino, California, 91436, <u>and</u> email Trustee's counsel such documents at: Meghann@MarguliesFaithLaw.com:

(a)    a deposit in the form of a cashier's check in the amount of $120,250.00 (i.e. 5% of the initial overbid purchase price) payable to "Jeremy W. Faith, Chapter 7 Trustee" (the "Deposit"); and

(b)    written evidence to demonstrate to the reasonable satisfaction of the Trustee in his sole discretion, that the proposed overbidder has the financial ability to pay the full amount of the overbid and unconditionally close the sale (e.g. pre-approved loan based on the buyer's written application and credit report, or have cash, and evidence of the same).

2.    A party's initial overbid must be no less than $2,405,000.00 (i.e. $10,000 above the current Purchase Price), with each additional bid in $5,000 increments.

3.    In his sole discretion, the Trustee may waive the deadline for submission of overbids. The acceptance of any overbid from a qualified bidder will be in the Trustee's sole discretion and may be made prior to or at the time of hearing to confirm the sale.[11]

4.    If qualified overbids are received and accepted by the Trustee, an auction will be held at the time of the hearing on the Trustee's motion for approval of the proposed sale.  The Trustee will propose to the court that each overbid to be made at the hearing be at least $5,000 higher than the then-highest overbid.

5.    In the event the Trustee receives multiple overbids in the same amount, the Trustee will accept the overbids in the order they are received such that only the overbidder submitting such bid first will be deemed to have made a bid in such amount and the other overbidders must increase their bid to be eligible to purchase the 2690 Property.

6.    At the conclusion of the auction, the Trustee will have the right, based solely on his business judgment and sole discretion, to recommend to the court for confirmation the offer that the Trustee determines is the best overall offer.

7.    If the court approves the sale to a bidding party (hereinafter the "Successful Bidder"), the Successful Bidder will be bound by all of the terms of the Trustee's proposed Purchase Agreement except as to price, without contingencies of any kind (including any financing contingency).  The Successful Bidder's Deposit will be retained by the Trustee and will be applied to the sale price.  The Deposit will be non-refundable if, for any reason whatsoever, the Successful Bidder fails to close the sale timely.

8.    The closing will take place as soon as practicable after entry of the court's Sale Order, but no later than the first business day after fourteen (14) calendar days

---

[11] If the Trustee determines at or before the hearing that the bidding procedures should be altered, the Trustee will so apprise the court at or before the hearing and will request approval of the bidding procedures as revised.

1  following entry of the Sale Order.  The Trustee and the Successful Bidder may mutually

2  agree in writing to extend the time for closing.

3         9.     In his sole discretion, the Trustee may request that the court confirm one or

4  more "Back-Up Buyer(s)" so that if the Successful Bidder does not close timely the

5  Trustee may sell the 2690 Property to the Back-Up Buyer for the amount of such Back-

6  Up Buyer's last bid. The Back-Up Buyer's Deposit will be retained by the Trustee.  If the

7  sale to the Successful Bidder does not close timely, the Trustee will advise the Back-

8  Up Buyer accordingly.  The closing will take place on or before fourteen (14) calendar

9  days following the date on which the Trustee gives notice to the Back-Up Buyer of the

10  Successful Bidder's failure to close.  The Back-Up Buyer will be bound by all of the

11  terms of the Purchase Agreement except as to price, without contingencies (including

12  any financing contingency).  The Back-Up Buyer's Deposit will be applied to the sale

13  price.  The Deposit will be non-refundable if the Back-Up Buyer fails to close the sale

14  timely.

15         10.   If a qualified overbidder is not the Successful Bidder or the Back-Up Buyer,

16  the overbidder's Deposit will be returned to the overbidder within ten court days from

17  the date of the hearing.  If the sale to the Successful Bidder closes, the Back-Up

18  Buyer's Deposit will be returned to the Back-Up Buyer within ten (10) court days from

19  the date of closing.

20         11.   If the sale closes to a Successful Bidder or a Back-Up Buyer, the four and

21  one-half percent (4.5%) aggregate brokerage commission will be paid 2.4% to the

22  Broker for any buyer and 2.1% to the Trustee's Broker.

23  **IN THE EVENT THAT ANY BUYER FAILS TO PERFORM, THE DEPOSIT WILL BE**

24  **FORFEITED. ALL SALES ARE AS IS, WHERE IS, WITHOUT REPRESENTATIONS,**

25  **WARRANTY OR RECOURSE.**

26         The Trustee believes that the proposed overbid procedure, notice of which has

27  been given to all creditors and interested parties, will maximize the price ultimately

28  obtained for the 2690 Property as well as protect the Estate from parties who may wish

14

1  to participate in the overbid procedure, but who are ultimately unable to consummate

2  the sale transaction.  Accordingly, the Trustee requests that the court authorize the

3  overbid procedure discussed above.

4      **I.**  **Notice To Creditors**

5      Notice of this Motion has been transmitted to all creditors and parties in interest

6  in accordance with F.R.B.P. 2002(a)(2), 6004(a), and is being filed concurrently

7  herewith. Moreover, the Trustee has concurrently filed with the Court a "Notice of Sale

8  of Estate 2690 Property" so that the sale and the right to overbid on the sale is included

9  on the Bankruptcy Court's website.

10                       **III.**

11                  **ARGUMENT**

12     **A.**  **The Proposed Sale is in the Best Interest of the Estate**

13     A Chapter 7 trustee has the statutory duty to, among other things, "collect and

14 reduce to money the 2690 Property of the estate" and "close such estate as

15 expeditiously as is compatible with the best interests of parties in interest."  11 U.S.C. §

16 704(a)(1).  Section 363(b) of the Bankruptcy Code empowers a trustee to "use, sell or

17 lease. . .other than in the ordinary course of business, 2690 Property of the estate." In

18 considering a proposed transaction to use, sell, or lease, courts look at whether the

19 transaction is in the best interests of the estate based on the facts and history of the

20 case. *In re America West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (citing *In re*

21 *Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)). This requires examination of the

22 "business justification" for the proposed sale. *In re 240 North Brand Partners, Ltd.*, 200

23 B.R. 653 (B.A.P. 9th Cir. 1996); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830

24 (Bankr. C.D. Cal. 1991); *In re Ernst Home Center, Inc.*, 209 B.R. 974 (Bankr. W.D.

25 Wash. 1997).

26     Here, the Trustee believes that the proposed sale to the Purchaser for

27 $2,395,000 has a legitimate business justification, is in the best interest of the estate,

28 and as a result of the Subordination Agreement, is expected to provide a source of

funds from which unsecured creditors may be paid.  Based upon the current real estate market, the extensive marketing of the 2690 Property both prior to conversion of the Case and by the Trustee's court-approved real estate Broker, the Trustee believes that the Purchase Price represents the fair market value of the 2690 Property.  The offer from the Purchaser is the highest and best offer received by the Trustee.  The offer is all-cash, and the Purchaser has waived all contingencies of the sale.

Based on the foregoing, the Trustee has determined that selling the 2690 Property to the Purchaser, subject to overbidding, is in the best interest of the Estate. Thus, the proposed sale represents a sound exercise of the Trustee's business judgment and should be approved by the court.

**B. The Court Should Approve the Sale Free and Clear of Liens, Interests and Encumbrances**

The Bankruptcy Court has the power to authorize the sale of 2690 Property free and clear of liens or interest.  *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 f.2d 730, 733 (9th Cir. 1990).  Section 363(f) permits a sale of property "free and clear of any interest in such property of an entity other than the estate" if <u>any one</u> of the following five conditions is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is a bona fide dispute; or (5) such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, the Trustee need only demonstrate that one of the five elements of this section exists to sell the 2690 Property free and clear of liens.  *See e.g., Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988).

1.    <u>Real Property Taxes</u>

To date, the Trustee is informed and believes that the 2690 Property has

secured tax obligations, which are a lien not yet due and payable to the County of
Santa Barbara, including any assessments collected with taxes, to be levied for the
fiscal year 2022-2023.  The Trustee seeks to sell the 2690 Property free and clear of
these liens pursuant to 11 U.S.C. § 363(f)(3), with said liens to attach to the proceeds
of the sale.  The Trustee will seek to pay the pro-rata amount due and owing on the first
installment for the 2022-2023 fiscal year through the close of the sale. To the extent
that there is any dispute (which the Trustee does not anticipate), payment will be made
pursuant to further order of this court (to the extent necessary).

      2.    Shellpoint Deed of Trust

      The Trustee is informed and believes that Shellpoint Mortgage, servicer for The
Bank of New York Mellon fka The Bank of New York as Trustee for the
Certificateholders of CWALT, Inc., Alternative Loan Trust 2006-Hy3, Mortgage
Passthrough Certificates, Series 2006-HY3 (defined *supra* as "Shellpoint") asserts a
first position deed of trust secured by the 2690 Property in the approximate amount of
$1,829,255.02.  The Trustee seeks to sell the 2690 Property free and clear of this lien
pursuant to 11 U.S.C. § 363(f)(3), with said lien to attach to the proceeds of the sale.
Following the Trustee's approval of Shellpoint's updated payoff demand, to include any
additional accrued mortgage and interest payments, the Trustee seeks authorization to
pay the first trust deed in full either directly from escrow or from the Estate's account
after close of the sale.  To the extent that there is any dispute (which the Trustee does
not anticipate), payment will be made pursuant to further order of this court (to the
extent necessary).

      3.    The Disputed WAMU Lien

      The Trustee will sell the 2690 Property free and clear of the WAMU Lien as a
contested lien pursuant to 11 U.S.C. § 363(f)(4), with said lien to attach to the proceeds
of the sale in the same priority, extent, and validity as the lien currently exists.

      Here, the WAMU Lien is subject to a bona fide dispute since there are contested
issues relating to the validity of WAMU's Deed of Trust as the Trustee has received

information that the WAMU Lien was previously paid in full when the Debtor refinanced the 2690 Property in 2006.  As such, the Trustee may sell the 2690 Property pursuant to 11 U.S.C. § 363(f)(4) free and clear of the WAMU Lien with said lien to attach to the sale proceeds to the same priority, extent and validity as it currently exists and will be held by the Trustee pending a consensual resolution or pursuant to further order of this court (to the extent necessary).

4.    Specialized Deed of Trust

The Trustee is informed and believes that the Bank of New York Mellon fka The Bank of New York, as Successor Trustee to JPMorgan Chase Bank, N.A., as Trustee on Behalf of the Certificateholders of the CWHEQ Inc., CWHEQ Revolving Home Equity Loan Trust, Series 2006-I c/o Specialized Loan Serving (defined *supra* as "Specialized") asserts a second position deed of trust against the 2690 Property in the approximate amount of $167,650.00.  The Trustee seeks to sell the 2690 Property free and clear of this lien pursuant to 11 U.S.C. § 363(f)(3), with said lien to attach to the proceeds of the sale.  Following the Trustee's approval of Specialized's updated payoff demand, to include any additional accrued mortgage and interest payments, the Trustee seeks authorization to pay the second trust deed in full either directly from escrow or from the Estate's account after close of the sale.  To the extent that there is any dispute (which the Trustee does not anticipate), payment will be made pursuant to further order of this court (to the extent necessary).

5.    The SBA Claim

The SBA asserts a third position deed of trust secured by the 2690 Property in the amount of at least $729,117.79.  As detailed above, the SBA Claim is cross-collateralized, and the SBA and the Trustee have entered into a Subordination Agreement providing for a portion of the SBA Claim to be assigned to the Estate for the benefit of creditors from the sale proceeds of the Properties.  As part of the Subordination Agreement, the SBA has consented to the sale of the 2690 Property free and clear of this lien pursuant to 11 U.S.C. § 363(f)(2), with said lien to attach to the

1  proceeds of the sale.  Pending Bankruptcy Court approval of the Subordination

2  Agreement, the Trustee will seek to pay the SBA from the net sales proceeds in

3  accordance with the terms of the Subordination Agreement.

4        The Trustee is unaware of any other liens, claims, or interests being asserted

5  against the 2690 Property.  However, if the holder of such a lien or claim receives

6  notice of the sale and fails to object, the 2690 Property may also be sold free and clear

7  of that lien or claim under § 363(f)(2).  *See In re Haven Eldercare*, 390 B.R. 762, 771

8  (Bankr. D. Conn. 2008) (finding that sale free and clear is "appropriate by consent

9  pursuant to Section 363(f)(2)" whether "[t]here have been no objections filed or

10  presented"); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[I]mplied consent is

11  sufficient to authorize a sale under § 363(f)(2)."); *see also Citicorp Mortgage v. Brooks*

12  *(In re Ex-Cel Concrete Co.)*, 178 B.R. 198, 203 n.7 (9th Cir. BAP 1995) (noting that

13  approval of sale free and clear of interest of Citicorp would be permissible under §

14  363(f)(2) if there was "consent or non-opposition by Citicorp").  Accordingly, the Court

15  should order that the sale of the 2690 Property will be free and clear of all liens, claims,

16  and interests.

17        **C.  The Sale was Negotiated in Good Faith**

18        The Trustee requests as part of the approval of the proposed sale of the 2690

19  Property that the Court find the Purchaser or any successful overbidder is a "good faith"

20  purchaser within the meaning of section 363(m) of the Bankruptcy Code.

21        A good faith purchaser of 2690 Property is protected from the effects of reversal

22  of the order authorizing a sale as long as the trial court finds that the purchaser acted in

23  good faith and an aggrieved party fails to obtain a stay of the sale order.  11 U.S.C. §

24  363(m).  Although the Bankruptcy Code does not define "good faith," courts have

25  provided guidance as to the appropriate factors to consider.  Generally speaking, the

26  requirement that a purchaser act in good faith speaks to the integrity of his conduct in

27  the course of the sale proceeding and focuses primarily on the disclosure of all material

28  sale terms and the absence of fraud or collusion.  *See In re Pine Coast Enterprise, Ltd.*,

1  147 B.R. 30, 33 (Bankr. N.D. Ill. 1992); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

2  F.2d 143, 147 (3rd Cir. 1986).  A lack of good faith is shown by fraud, collusion

3  between the purchaser and other bidders or the trustee, or any attempt to take grossly

4  unfair advantage of other bidders.  *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992).

5      Here, the Purchaser is clearly identifiable and will be giving value.  There is no

6  affiliation between the Purchaser and the Trustee, the Duffs, or the Estate.  The

7  Purchase Agreement was negotiated at arms' length with all parties involved acting in

8  good faith.  There are no undisclosed side deals or terms.  *See* Faith Dec., ¶ 24.

9  Therefore, the Court should find that the Purchaser is a good faith purchaser pursuant

10  to 11 U.S.C. § 363(m) and entitled to the protections contained therein to provide

11  assurance that the purchase of the 2690 Property will not be subject to future attack by

12  creditors or a frivolous appeal.

13          **D.  The Waiver of the Stay is Appropriate**

14      Under the Federal Rules of Bankruptcy Procedure, an order authorizing the sale

15  of property or the assignment of an executory contract is stayed for fourteen (14) days

16  after the entry of the order, unless the court orders otherwise. *See* F.R.B.P. 6004(h);

17  *see also* F.R.B.P. 6006(d).  The Advisory Committee Note states that the court may, in

18  its discretion, order that the stay is inapplicable so that the sale or assumption may take

19  place immediately upon entry of the order. F.R.B.P. 6004(g) Advisory Committee's

20  Note.

21      Here, the waiver of the stay imposed by Rules 6004(h) and 6006(d) is

22  appropriate.  Time is of the essence in obtaining approval of the sale of the 2690

23  Property.  Moreover, the Trustee does not expect to receive any opposition to the

24  Motion.  Accordingly, the Trustee requests that the Court "order otherwise" and waive

25  the stay imposed by Rules 6004(h) and 6006(d).

26  ///

27  ///

28  ///

**IV.**

**<u>CONCLUSION</u>**

Based on the foregoing, the Trustee respectfully requests that this Court enter an order:

1. Approving the Motion;

2. Authorizing the sale of the 2690 Property to the Purchaser, or any successful overbidder, free and clear of any and all liens, encumbrances, claims, and interests pursuant to 11 U.S.C. § 363(b) and (f);

3. Approving the overbid procedures described herein;

4. Authorizing the Trustee to pay any outstanding property taxes that exist, including any delinquency payments and any applicable penalties pro-rata through the date of the close of the sale directly from escrow;

5. Authorizing the Trustee to pay the obligations on the deed of recorded on January 27, 2016, as Instrument No. 2006-6896, of the Official Records of Santa Barbara County directly to Shellpoint Mortgage Company, or its assignee directly from escrow;

6. Authorizing the Trustee to sell free and clear of the obligations on the deed of trust recorded by Washington Mutual Bank, FA, a Federal Association on January 27, 2006 as Instrument No. 2006-6897 of the Official Records of Santa Barbara County pursuant to 11 U.S.C. § 363(f)(4) as a disputed lien.

7. Authorizing the Trustee to pay the obligations on the deed of recorded on November 7, 2006, as Instrument No. 2006-87114, of the Official Records of Santa Barbara County directly to Specialized Loan Servicing, LLC, or its assignee directly from escrow;

8. Authorizing to pay the obligations on the deed of recorded on July 27, 2010, as Instrument No. 2010-39625, of the Official Records of Santa Barbara County directly to the United States Small Business Administration pursuant to the terms of the Subordination Agreement between the parties;

9. Authorizing the payment of the four and one-half percent (4.5%) real estate broker's commission of the gross sales price and ordinary costs of sale directly from escrow without further order of the court;

10. Finding that the Purchaser, the Successful Overbidder, and any Back-Up Bidder is a "good faith" purchaser pursuant to 11 U.S.C. § 363(m);

11. Finding that the notice given by the Trustee in connection with the sale and the hearing thereon is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

12. Waiving the 14-day stay imposed by F.R.B.P. 6004(h) and F.R.B.P. 6006(d);

13. Finding that the Trustee is authorized and empowered to execute and deliver on behalf of the estate any and all documents as reasonably necessary to implement the terms of the proposed sale;

14. Retaining jurisdiction to adjudicate any disputes that may arise in connection with this Motion or the sale; and

15. Granting such other and further relief as is just and appropriate.

DATED:  November 15, 2022                    **MARGULIES FAITH, LLP**

By: _/s/ Meghann A. Triplett_
Meghann A. Triplett
Samuel M. Boyamian
Attorneys for Jeremy W. Faith, Chapter 7
Trustee

1

## DECLARATION OF JEREMY W. FAITH

2      I, Jeremy W. Faith, declare as follows:

3      1.      I am the Chapter 7 trustee for the bankruptcy estate ("Estate") of

4 Charles L. Duff ("Debtor").

5      2.      I make this declaration in support of the attached motion for an order: (1)

6 authorizing the sale of the Estate's right, title, and interest in real property, free and

7 clear of all liens, claims, and interests pursuant to 11 U.S.C. § 363(b) and (f); (2)

8 approving the overbidding procedures set forth in this motion; (3) finding that the

9 purchaser, and if applicable, the successful overbidder, and back-up bidder are good

10 faith purchasers pursuant to 11 U.S.C. § 363(m); (4) authorizing the payment of

11 undisputed liens, the real estate broker's commission, and ordinary costs of sale; and

12 (5) waiving the 14-day stay prescribed by F.R.B.P. 6004(h) and 6006(d) (the "Motion").

13 All terms not otherwise defined herein are used as they are defined in the Motion.

14      3.      Unless otherwise stated, the facts set forth in this declaration are

15 personally known to me and if called as a witness, I could and would competently

16 testify thereto.

17      4.      I seek approval to sell real property commonly known as 2690 Gibraltar

18 Road, Santa Barbara, California 93105 (the "2690 Property") to the Gary R.

19 L'Hommedieu and Caitlin K. L'Hommedieu Trust or its assignee ("Purchaser") or to any

20 winning overbidder at the time of the sale (the "Sale") pursuant to the terms of the

21 Counter-Offer (referred to herein as the "Purchase Agreement") attached as **Exhibit 1**,

22 for total consideration of $2,395,000.00 (the "Purchase Price").

23      5.      I believe the proposed Purchase Price is fair market value.  To date, the

24 current offer from the Purchaser, is the highest and best offer I have received for the

25 2690 Property.

26      6.      The current offer from the Purchaser is the highest and best offer I have

27 received for the 2690 Property.  The Purchaser has provided me with proof of funds

28 and has paid an initial deposit of $71,850.00 (the "Deposit") into escrow pursuant to the

1  Purchase Agreement which I am holding in escrow subject to court approval and

2  closing of the sale.[12] As set forth in the Purchase Agreement, the 2690 Property shall

3  be delivered vacant at close of escrow, however, in the event the 2690 Property is not

4  vacant by the scheduled closing date, the Purchaser agreed to extend escrow until

5  such time as the 2690 Property becomes vacant.

6       7.      I am providing marketable title to the 2690 Property. The sale is

7  otherwise "as-is," "where-is," "with all faults," and without representations or warranties

8  of any kind and is not subject to any contingencies.

9       8.      As part of my investigation in this Case, I consulted with my real estate

10  agents to independently value the Properties.  I also obtained preliminary title reports

11  and copies of the underlying deeds of trust for the respective Properties to assess

12  potential liens and encumbrances.  Following conversion of the Case, my real estate

13  agent, Stan Tabler of Compass California inspected the Santa Barbara Properties and

14  informed me that the 2690 Property had a market value of $2,010,000 and the 2835

15  Property had a market value of $3,100,000.

16       9.      I am informed that the Debtor marketed the Santa Barbara properties for

17  an extended period both pre-petition and during the approximate four-year period the

18  Case was in chapter 11 and failed to sell either of the Santa Barbara Properties.  The

19  Debtor also made no effort to sell the Oregon Property.  Further, apart from paying the

20  real property taxes, the Debtor has not paid any of the secured debt on the Santa

21  Barbara Properties for more than four years, which in combination with a drop in the

22  real estate market has substantially decreased the available equity in the Santa

23  Barbara Properties.[13]  Following conversion of the Case, the Debtor ceased paying the

24

25  _____

26  [12] The Purchase Deposit shall be refunded to the Purchaser if the Trustee is unable to
close the sale, or the Purchaser is not the approved overbidder.

27  [13] For example, Shellpoint's asserted first position lien on the 2690 Property has
increased by almost $260,000, from $1,577,821.16 as reflected in Shellpoint's proof of

28  claim no. 8 filed on February 27, 2019, to $1,836,188.18 as of September 13, 2022,

1  insurance on the Properties, I obtained replacement insurance on the Properties

2  effective October 1, 2022 which I have kept in place at an aggregate cost to the Estate

3  of $6,707.99 per month.

4        10.      On September 29, 2022, I filed my *Application to Employ Coldwell*

5  *Banker Realty and Compass California* (the "Broker") as my real estate broker and

6  enter into *Exclusive Listing Agreement* effective August 30, 2022 to market and sell the

7  Santa Barbara Properties (the "Broker Application," Dkt. No. 313).  On October 18,

8  2022, the court entered an order approving the Broker's employment on the terms and

9  conditions set forth in the Broker Application pursuant to 11 U.S.C. §§ 327 and 328

10  (Dkt. No. 320).

11        11.      Following entry of the order approving the Broker Application, at my

12  request, the Broker agreed to reduce its commission to four and one-half (4.5%) of the

13  gross sales price of each of the Santa Barbara Properties (the "Commission

14  Reduction").  A copy of the escrow instruction providing for the Commission Reduction

15  of the 2690 Property is attached as **Exhibit 3**.[14]

16        12.      A true and correct copy of a preliminary title report for the 2690 Property

17  as of September 19, 2022 (the "Title Report") which was received from First American

18  Title Company is attached as **Exhibit 2**.

19        13.      I am informed and believe that the 2690 Property has secured tax

20  obligations, which are a lien not yet due and payable to the County of Santa Barbara,

21  including any assessments collected with taxes, to be levied for the fiscal year 2022-

22  2023.  I seek authority to sell the 2690 Property free and clear of these liens pursuant

23

24  ─────────────────────────────

25  with interest continuing to accrue on the loan at a per diem rate of $103.480/day pursuant to a payoff demand I obtained.
[14] To achieve the Commission Reduction for the 2690 Property, it was agreed that the

26  Purchaser's Broker reduce his commission to 2.4% and the Trustee's Broker reduce their portion of the commission to 2.1% for a total aggregate brokerage commission

27  equal to 4.5% of the gross sales price. The same terms shall apply to the broker of any Successful Bidder or Back-Up-Buyer.

28

to 11 U.S.C. § 363(f)(3), with said liens to attach to the proceeds of the sale.  I will seek

to pay the pro-rata amount due and owing on the first installment for the 2022-2023

fiscal year through the close of the sale which escrow currently estimates to be

$1,139.71. To the extent that there is any dispute (which I do not anticipate), payment

will be made pursuant to further order of this court (to the extent necessary).

14.     I am informed and believes that Shellpoint Mortgage, servicer for The

Bank of New York Mellon fka The Bank of New York as Trustee for the

Certificateholders of CWALT, Inc., Alternative Loan Trust 2006-Hy3, Mortgage

Passthrough Certificates, Series 2006-HY3 ("Shellpoint") asserts a first position deed of

trust secured by the 2690 Property in the approximate amount of $1,829,255.02.  I

seek authorization to sell the 2690 Property free and clear of this lien pursuant to 11

U.S.C. § 363(f)(3), with said lien to attach to the proceeds of the sale.   Following my

approval of Shellpoint's updated payoff demand, to include any additional accrued

mortgage and interest payments, I seek authorization to pay the first position deed of

trust in full either directly from escrow or from the Estate's account after close of the

sale.  To the extent that there is any dispute (which I do not anticipate), payment will be

made pursuant to further order of this court (to the extent necessary).

15.     As reflected on the Title Report, Item No. 6 is a *Deed of Trust* recorded

by Washington Mutual Bank, FA, a Federal Association ("WAMU") as Instrument No.

2006-0006897 in the Santa Barbara County Recorder's Office on January 27, 2006, to

secure the repayment of a $225,000 equity line of credit (the "WAMU Lien").  I have

received information from the Duffs that the WAMU Lien was paid in full when the

Debtor refinanced the 2690 Property with Countrywide Home Loans in 2006 and

WAMU never removed its lien.  Based on my review of the appliable title documents,

and consultation with my counsel, I further believe that the WAMU Lien was only

secured by the 2835 Property and the lien was improperly recorded against the 2690

Property.  I seek authorization to sell the 2690 Property free and clear of the WAMU

1  Lien as a contested lien pursuant to 11 U.S.C. § 363(f)(4) and may file an adversary

2  proceeding to resolve the dispute.

3       16.     I am informed and believes that the Bank of New York Mellon fka The

4  Bank of New York, as Successor Trustee to JPMorgan Chase Bank, N.A., as Trustee

5  on Behalf of the Certificateholders of the CWHEQ Inc., CWHEQ Revolving Home

6  Equity Loan Trust, Series 2006-I c/o Specialized Loan Serving ("Specialized") asserts a

7  second position deed of trust against the 2690 Property in the approximate amount of

8  $167,650.00.  I seek authorization to sell the 2690 Property free and clear of this lien

9  pursuant to 11 U.S.C. § 363(f)(3), with said lien to attach to the proceeds of the sale.

10  Following my approval of Specialized's updated payoff demand, to include any

11  additional accrued mortgage and interest payments, I seek authorization to pay the

12  second trust deed in full either directly from escrow or from the Estate's account after

13  close of the sale.  To the extent that there is any dispute (which I do not anticipate),

14  payment will be made pursuant to further order of this court (to the extent necessary).

15       17.     I am informed that the U.S. Small Business Administration (the "SBA")

16  asserts a third position deed of trust secured by the 2690 Property in the amount of at

17  least $729,117.79.  As reflected by the title documents included with the Title Report

18  and proof of claim no. 6 filed by the SBA on December 6, 2018, the SBA holds a cross-

19  collateralized lien, and is secured by a deed of trust recorded against each of the

20  Debtor's three Properties (the "SBA Claim").

21       18.     To induce me to proceed with the administration of the Estate and

22  distribute funds to creditors, the SBA and I have agreed to terms for a *Partial*

23  *Subordination Agreement and Limited Release* (the "Subordination Agreement")

24  regarding the sale of the three Properties, subject to court approval of the

25  Subordination Agreement and the underlying sales.  The SBA has consented to the

26  sale of the 2690 Property free and clear of its lien pursuant to 11 U.S.C. § 363(f)(2) and

27  as detailed in the Motion will be paid pursuant to the terms of the Subordination

28

1   Agreement which will result in an estimated $200,000 in net sales proceeds for the
2   Estate.

3       19.     Among other things, the proposed Subordination Agreement provides
4   for the partial subordination and transfer of the subordinated portion of the SBA Claim
5   to me for the benefit of the Estate.  I anticipate finalizing the Subordination Agreement
6   and filing a *Motion for Order Approving Compromise of Controversy with the SBA*
7   pursuant to F.R.B.P. 9019 ("9019 Motion") and related notice for approval of the
8   Subordination Agreement within the next week.

9       20.     The proposed Subordination Agreement provides for $300,000 of the
10  SBA Claim secured by the three Properties ("Subordinated Portion") to be subordinated
11  to the Chapter 7 and 11 administrative claims, and general unsecured creditors of the
12  Debtors' Estate, with the remainder retaining the same validity, priority, and extent that
13  would otherwise exist under California law, pursuant to 11 U.S.C. § 510(c)(1).  Further,
14  pursuant to 11 U.S.C. § 510(c)(2), the lien securing the Subordinated Portion of the
15  SBA Claim shall be transferred to the Estate with the Estate receiving all associated
16  rights held by SBA as to the subordinated portion of the SBA Claim.  The balance of
17  the non-subordinated portion of the SBA Claim will be retained by the SBA as an
18  allowed secured claim.  The balance of the SBA Claim not paid from the sale of the
19  Properties, including the Subordinated Portion, will be allowed as a general unsecured
20  claim in the Case.  Absent the Subordination Agreement with the SBA, there would be
21  insufficient equity for me to administer the Properties.

22      21.     The proposed Subordination Agreement provides for the SBA Claim to
23  be distributed as follows:

24      (e) The balance of the nonsubordinated portion of the SBA Claim will be
        retained by the SBA as an allowed secured claim.  The balance of the
25      SBA Claim not paid from the sale of the Properties, including the
        Subordinated Portion, will be allowed as a general unsecured claim in the
26      Bankruptcy Case;

27      (f)  The SBA Claim against 2835 Gibraltar will be partially subordinated in
        an amount equal to: (i) all costs of sale, including commissions; and (ii)
28      the remaining net sales proceeds after payment of all costs of sale,
        commissions, senior secured liens, including real property taxes shall be

paid to the SBA by the Trustee through escrow towards the balance of the SBA Claim;

(g) The SBA Claim against 2690 Gibraltar will be partially subordinated in the amount equal to: (i) all costs of sale, including commissions; and (ii) the first $200,000 after payment of the liens senior to the SBA, including real property taxes shall be paid to the Estate through escrow; (iii) the remaining net sales proceeds after payment of (i) and (ii) shall be paid to the SBA by the Trustee through escrow towards the balance of the SBA Claim; and

(h) The SBA Claim against the Oregon Property will be partially subordinated in the amount equal to: (i) all costs of sale, including commissions; and (ii) the first $100,000 after payment of the liens senior to the SBA Claim including real property taxes shall be paid to the Estate through escrow; and (iii) the remaining net sales proceeds after payment of (i) and (ii) shall be paid to the SBA by the Trustee through escrow towards the balance of the SBA Claim.

20.    I believe that a sale free and clear of all liens, claims, and interests pursuant to 11 U.S.C. § 363(f) will result in the best result for the Estate and as a result of the Subordination Agreement, is anticipated to generate substantial distributions for the benefit of creditors.

22.    I am seeking to pay 4.5% of the gross sales price in brokerage commissions and to pay all customary title, escrow, and closing costs through escrow. Assuming a purchase price of $2,3950,000, the amount of $107,775 will be paid in brokerage commissions. I estimate closing costs will be approximately $47,900 (2% of the Purchase Price). I am seeking authority to distribute the sale proceeds in the amounts estimated below, based on an initial gross sale price of $2,395,000.00:

| Description | Amount |
| --- | --- |
| Property Taxes | ($1,139.71) |
| Shellpoint | ($1,836,188.18) |
| WAMU (disputed deed of trust) | $0.00 |
| Specialized | ($167,680.00) |
| Real Estate Commissions (4.5%) | ($107,775.00) |
| Costs of Sale (title, escrow, taxes, recording (2%) | ($47,900.00) |
| *Net to be split between the SBA and the Estate pursuant to Subordination Agreement* | $234,317.11 |
| -Estate's Portion | $200,000.00 |
| -SBA's Portion | $34,317.11 |

21.    I have consulted with my accountant about the tax implications of the sale of the 2690 Property. Specifically, my accountant has reviewed the transaction and determined there will be no taxes/negative tax implications arising from the sale of the Property that would prevent a sale from moving forward. Specifically, my accountant has informed me that there are sufficient deductions to offset the gain at the current sales price.

22.    I believe that unless there are objections to the Motion that are not consensually resolved, it is appropriate and good cause exists for the court to order that Rule 6004(h) is not applicable and the 2690 Property may be sold immediately.

23.    I believe the Motion satisfies the standards for approval of a sale of property outside the ordinary course of business pursuant to 11 U.S.C. § 363(b).

24.    I am unaware of any connection between myself and the Purchaser except through this sale.  The sale was negotiated at arms' length through each parties' respective brokers.  There are no undisclosed side deals or terms.  Therefore, I believe good cause exists to make a finding that the Purchaser or any overbidders are purchasing the 2690 Property in "good faith" pursuant to 11 U.S.C. § 363(m) and entitled to the protections contained therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed November *15*, 2022 at Encino, California.

_____
Jeremy W. Faith

# Exhibit 1

## COUNTER-OFFER

   This agreement (the "Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Gary R. L'Hommedieu and Caitlin K. L'Hommedieu Trust (the "Buyer") from Jeremy W. Faith  (the "Seller" or "Trustee"), solely in her capacity as the duly appointed, qualified, and acting chapter 7 trustee for the bankruptcy estate of Charles Duff ("the "Debtor"), of the real property more commonly known as 2690 Gibraltar Rd, Santa Barbara, California (the "Property").  When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety Buyer's written Residential Property Purchase Agreement and all attachments in support thereof dated September 19, 2022 (the "Offer") and any oral or written negotiations since the Offer.

**PURCHASE PRICE; DEPOSIT; ESCROW.**  The purchase price for the Property shall be **$2,395,000** (the "Purchase Price"). Buyer shall make an initial deposit of **$71,850** (the "Initial Deposit") in the form of cashier's check or wire transfer made payable to "A&A Escrow Services, Inc." (the "Escrow Holder") which shall be delivered to A&A Escrow Services, Inc., 415 N Crescent Drive, Suite 320, Beverly Hills, California 90210, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.

**FINANCIAL WHEREWITHAL.**  Buyer shall deliver to the Seller, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit, loan commitment, or other form acceptable to Seller in Seller's sole discretion.  In the event that either (i) Buyer fails timely to provide any such proof, or (ii) Seller determines, in Seller's sole discretion, that any proof of funds provided to Seller by Buyer is unacceptable, Seller shall have the right, at Seller's option, to provide written notice to Buyer that this Counter-Offer is terminated.  In the event that Seller exercises such termination right, this Counter-Offer shall terminate effective as of the date of Seller's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Seller shall each be relieved of any further obligations hereunder.

**ESCROW INSTRUCTIONS.**  Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions.  Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale.  Prior to the Trustee's filing of her motion to approve the sale of the Property, Buyer shall be free to assign this Agreement to another

Exhibit 1                                              Page 31

person or entity (the "Assignee") subject to Seller's prior review and written approval (which approval Seller may grant or withhold in her sole discretion), but Buyer shall remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.  Buyer shall not assign this Agreement to another person or entity after the Trustee has filed her motion for approval of the sale of the Property with the Bankruptcy Court.

**BUYER'S DUE DILIGENCE**  Buyer has completed all inspections, investigations, tests and review of reports and all due diligence which Buyer desires for the Sale of the Property and hereby waives the inspection contingency.

**ALL CASH.**  Buyer is paying all cash and waives the financing and appraisal contingencies.

**TITLE; TITLE INSURANCE.**  Buyer has reviewed and approved First American Title Preliminary Title Report order # 4001-6885270.  At the close of the Sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary title report  free and clear of all monetary liens, subject to the terms of the Agreement and the order approving the Sale.  Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

**REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION.**  Buyer has removed all of Buyer's contingencies and shall proceed with the Sale.  Seller shall then file a motion with the Bankruptcy Court to confirm the Sale, which sale shall be subject to qualified overbids as approved by the Bankruptcy Court.  Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the Sale, subject only to Bankruptcy Court confirmation as set forth below.  If the Bankruptcy Court confirms the Sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the Sale, but no later than the later to occur of (i) the first business day after fourteen (14) calendar days following the entry of the operative Order of the Bankruptcy Court approving the Sale or (ii) if the effectiveness of the Order of the Bankruptcy Court approving the Sale is stayed, the first business day after the Order is no longer stayed (the "Closing Date").  The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located. Property shall be delivered vacant at close of escrow, however, in the event property is not vacant by the scheduled closing date, Buyer agrees to extend escrow until such time as property becomes vacant.

**BANKRUPTCY SALE.**  Buyer acknowledges that Seller is a trustee duly appointed to administer the Debtors' bankruptcy estate, and is a party to this Agreement solely in that capacity.  Seller and her brokers and agents (collectively, the "Seller's Brokers") have not and will not determine the condition or fitness for use of the Property for any particular purpose. The Sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Seller's Brokers herein.  Transfer of the Property shall be by Quitclaim Deed.  All parties acknowledge that Seller is a party to this Agreement solely in her capacity

as trustee of the Debtors' estate and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against Seller, the Trustee, or the estate in connection with this transaction, the Trustee shall in no event have any personal liability whatsoever (whether in her individual capacity or otherwise), it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of the Debtors' estate.

**PERSONAL PROPERTY.**  All appliances, if considered real property shall be included. The two refrigerators are excluded.

**PROPANE TANK.**  Buyer understands propane tank and system is leased.

**TAXES; PRORATIONS; COSTS OF SALE.**  All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer.  The Sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the Sale.  Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located.  Seller shall pay any real property transfer tax.  Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this Sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements.  Buyer shall pay the cost of recording the deed.  Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

**BANKRUPTCY COURT APPROVAL; OVERBIDDING.**  The Sale is subject to notice to creditors, approval by the Bankruptcy Court, and better qualified bids received by Seller through and including the Bankruptcy Court hearing to confirm the Sale.  Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court.  Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so.  Buyer acknowledges and agrees that if the Bankruptcy Court approves the Sale to a different buyer (the "Successful Overbidder") at the hearing on the Sale, the Trustee may hold the Buyer's deposit pending close of the Sale to the Successful Overbidder and, if the Successful Overbidder does not timely close its purchase of the Property, the Trustee has the right to close the Sale to the Buyer at the Purchase Price hereunder, or such higher price as the Buyer may have bid at the hearing on the Sale.

**BROKERS.**  Seller is represented by Coldwell Banker and Compass.  Buyer is represented by Berkshire Hathaway Home Services. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property as follows: 1.25% to Coldwell Banker, 1.25% to Compass and 2.5% to Berkshire Hathaway Home Services in connection with the closing of the Sale.  Seller's Brokers and Buyer's Brokers are collectively referred to herein as the "Brokers".  No commission or compensation shall be due or payable to Brokers in connection with this Agreement or Sale except from the

Page 3 of 9

Exhibit 1    Page 33

cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder, or other person entitled to any fee, commission, or other compensation in connection with the Sale and Buyer shall indemnify, defend, protect, and hold Seller and the related bankruptcy estate harmless of, from, and against any claims, demands, actions, causes of action, losses, liabilities, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions, or other compensation of any kind are hereafter asserted.

**MATERIAL CHANGE OF CONDITION.** In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (i) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the Initial Deposit shall be refunded to Buyer without interest; or (ii) make required repairs at the bankruptcy estate's expense; or (iii) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the Sale; or (iv) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart (b), (c), or (d) of this paragraph, Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Conditions related to the Covid-19 pandemic shall not constitute a material change in condition under this Counter-Offer.

**REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.** Buyer's sole remedy in the event that the Sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the Sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Initial Deposit (plus any increase thereof by Buyer). In the event Buyer fails to close the Sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under this Agreement, Buyer's Initial Deposit (plus any increase thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action. This provision shall apply equally to the Initial Deposit (and any increase thereof by Buyer) without interest. If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT TIME OF ANY INCREASED DEPOSIT, BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R.FORM RID).

[Buyer(s) Initials]

**BANKRUPTCY COURT JURISDICTION.** The United States Bankruptcy Court for the Central District of California, Los Angeles Division shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to

Exhibit 1    Page 34

DocuSign Envelope ID: 8515EBAF-5D4B-4660-B70C-03D3CFA55D2D

such exclusive jurisdiction.  This Agreement shall be interpreted and enforced pursuant to the laws of the State of California, the United States of America, and title 11 of the United States Code.

**"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.**  Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement.  Seller and Seller's Brokers have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) the value of the Property; (ii) the income to be derived from the Property; (iii) the suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) the manner, quality, state of repair, or lack of repair of the Property; (vi) the nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) the compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) the manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) the compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601, et seq.), the Clean Water Act (33 U.S.C. § 1251, et seq.), California Health and Safety Code §§ 25117 or 25316, or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any due diligence materials or preliminary report regarding title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter.  Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Brokers have provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation,

Exhibit 1                                                                   Page 35

information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Brokers shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

**BROKERS.**  Seller's Brokers herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer.  In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Seller's Brokers, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

**OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.**  Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property.  In deciding to proceed with the Sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller.  Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor Seller's Brokers nor any other person has made or makes any representations as to the accuracy or completeness of such information.  Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Seller's Brokers from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation.  NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER.  Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

**RETROFITTING.**  All required retrofitting including but not limited to the installation of smoke and carbon monoxide detectors, low flow toilets and compliance with all governmental agencies shall be Buyer's responsibility for cost and completion.

**EFFECT OF INFEASIBLE OR UNPROFITABLE SALE.** To the extent that liens, claims, encumbrances or other interests against the Property, if any, or any event, makes the sale infeasible or unprofitable to the Bankruptcy Estate, the Seller may cancel any proposed sale under this Agreement. In such case, the Buyer agrees to fully and completely release Seller from any and all obligations under this Agreement. In addition, any escrow shall be cancelled.

 [Buyer(s) Initials]

**COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES.** Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements, or improvements to the Property except as may otherwise be expressly stated herein. Without limiting any other provision hereof, Buyer represents, warrants, and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

**WRITTEN AFFIRMATION OF SELLER REQUIRED.** Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several counter-offers concurrently containing the same or different terms. This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's "Affirmation of Agreement" attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement. Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

**ATTORNEYS' FEES.** In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**EXPIRATION OF COUNTER-OFFER.**  This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller, on or before 5:00 p.m., Pacific time, on September 23, 2022.  Such acceptance shall nevertheless be subject to the receipt of Seller's Affirmation of Agreement.

**AGREED AND ACCEPTED:**

BUYER:

Dated: 9/21/2022        9/21/2022

By:

Gary R. L'Hommedieu and Caitlin K. L'Hommedieu Trust

SELLER (subject to execution of Seller's Affirmation of Agreement):

Dated: 9-20-2022

By:

Jeremy W. Faith solely in capacity as Chapter 7 Trustee for Charles Duff

## EXHIBIT "A"

## SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and any qualified overbidders.  Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this Agreement.

SELLER

Dated: _____9-21-2022_____

By: _____
Jeremy W. Faith, solely in capacity as Chapter 7 Trustee for Charles Duff

Exhibit 1                    Page 39

# Exhibit 2

CLTA Preliminary Report Form
(Rev. 11/06)

Order Number:  4001-6885270
Page Number:  1



# First American Title Company

899 Pacific Street
San Luis Obispo, CA 93401
California Department of Insurance License No. 151

Antonia Delgado
A & A Escrow Services, Inc
Phone: (310)550-6055
Customer Reference: Escrow #105615-AA

| | |
|---|---|
| Title Officer: | Lisa Irot |
| Phone: | (805)786-2042 |
| Fax No.: | (866)397-7092 |
| E-Mail: | lirot@firstam.com |

| | |
|---|---|
| E-Mail Loan Documents to: | Lenders please contact the Escrow Officer for email address for sending loan documents. |
| Owner: | Charles Duff and Cathryn Alice Duff |
| Property: | 2690 Gibraltar Road Santa Barbara, CA 93105 |

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. *The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.* Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.

It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

Please be advised that any provision contained in this document, or in a document that is attached, linked or referenced in this document, that under applicable law illegally discriminates against a class of individuals based upon personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or any other legally protected class, is illegal and unenforceable by law.

CLTA Preliminary Report Form
(Rev. 11/06)

Order Number:  4001-6885270
Page Number:  2

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Order Number:  4001-6885270
Page Number:  3

Dated as of September 19, 2022 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

ALTA/CLTA Homeowner's (EAGLE) Policy of Title Insurance (2013) and ALTA Ext Loan Policy 1056.06
(06-17-06) if the land described is an improved residential lot or condominium unit on which there is
located a one-to-four family residence: or ALTA Standard Owner's Policy 2006 (WRE 06-17-06) and the
ALTA Loan Policy 2006 (06-17-06) if the land described is an unimproved residential lot or condominium
unit

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

Charles Duff and Cathryn Alice Duff, husband and wife as Community Property, subject to
proceedings pending in the Bankruptcy Court of the Central District of the U. S. District Court,
California entitled in re: Charles L. Duff , debtor, Case No. 9:18-BK-11889-DS, wherein a petition for
relief was filed on November 12, 2018.

The estate or interest in the land hereinafter described or referred to covered by this Report is:

FEE

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said
policy form would be as follows:

1.    General and special taxes and assessments for the fiscal year 2022-2023, a lien not yet due or
      payable.

2.    The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75
      of the California Revenue and Taxation Code.

3.    An easement for DEVELOPMENT OF TUNNEL SHAFT, BUILD DAMS AND DIVERT WATER SO
      DEVELOPED and incidental purposes, recorded SEPTEMBER 27, 1894 in Book 38 of Deeds, Page 387.
      In Favor of:          J.D. AXTELL
      Affects:              AS DESCRIBED THERE IN.

Order Number:  4001-6885270
Page Number:  4

The location of the easement cannot be determined from record information.

4.    Covenants, conditions, restrictions and easements in the document recorded OCTOBER 27, 1976 as INSTRUMENT NO. 46075, BOOK 2631, PAGE 2096 of Official Records, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

5.    A deed of trust to secure an original indebtedness of $1,500,000.00 recorded JANUARY 27, 2006 as INSTRUMENT NO. 06-6896 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | JANUARY 20, 2006 |
| Trustor: | CHARLES DUFF, AND CATHRYN ALICE DUFF, HUSBAND AND WIFE AS COMMUNITY PROPERTY |
| Trustee: | RECONTRUST COMPANY, N.A. |
| Beneficiary: | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. |
| LENDER: | COUNTRYWIDE HOME LOANS, INC. |

According to the public records, the beneficial interest under the deed of trust was assigned to THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2006-HY3, MORTGAGE PASSTHROUGH CERTIFICATES, SERIES 2006-HY3 by assignment recorded APRIL 02, 2012 as INSTRUMENT NO. 12-21236 OF OFFICIAL RECORDS.

A document recorded MAY 17, 2017 as INSTRUMENT NO. 17-23456 OF OFFICIAL RECORDS provides that BARRETT DAFFIN FRAPPIER TREDER & WEISS, LLC was substituted as trustee under the deed of trust.

6.    A deed of trust to secure an original indebtedness of $225,000.00 recorded JANUARY 27, 2006 as INSTRUMENT NO. 06-6897 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | NOT SHOWN |
| Trustor: | CHARLES DUFF AND CATHRYN ALICE DUFF |
| Trustee: | OPTIMA |
| Beneficiary: | WASHINGTON MUTUAL BANK, FA, A FEDERAL ASSOCIATION |
| | |
| Affects: | The land and other property. |

The above deed of trust states that it secures an equity line/revolving line of credit. Prior to the payment and suspension of the equity line/revolving line of credit, an instruction to suspend and close the equity line/revolving line of credit pursuant to CA Civil Code Section 2943.1 must be executed by the borrower.

Order Number: 4001-6885270
Page Number: 5

7.  A deed of trust to secure an original indebtedness of $150,000.00 recorded NOVEMBER 07, 2006 as
    INSTRUMENT NO. 06-87114 OF OFFICIAL RECORDS.
    Dated:                      OCTOBER 27, 2006
    Trustor:                    CHARLES DUFF, AND CATHRYN ALICE DUFF, HUSBAND
                                AND WIFE AS COMMUNITY PROPERTY
    Trustee:                    RECONTRUST COMPANY, N.A.
    Beneficiary:                MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
    LENDER:                     COUNTRYWIDE BANK, N.A.

    The above deed of trust states that it secures an equity line/revolving line of credit. Prior to the
    payment and suspension of the equity line/revolving line of credit, an instruction to suspend and
    close the equity line/revolving line of credit pursuant to CA Civil Code Section 2943.1 must be
    executed by the borrower.

    According to the public records, the beneficial interest under the deed of trust was assigned to THE
    BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS SUCCESSOR TRUSTEE TO
    JPMORGAN CHASE BANK, N.A., AS TRUSTEE ON BEHALF OF THE CERTIFICATEHOLDERS OF THE
    CWHEQ INC., CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2006-I by assignment
    recorded JUNE 08, 2012 as INSTRUMENT NO. 12-37246 OF OFFICIAL RECORDS.

    A document recorded DECEMBER 06, 2021 as INSTRUMENT NO. 21-83108 OF OFFICIAL RECORDS
    provides that AFFINIA DEFAULT SERVICES, LLC was substituted as trustee under the deed of trust.

8.  A deed of trust to secure an original indebtedness of $374,900.00 recorded JULY 27, 2010 as
    INSTRUMENT NO. 10-39625 OF OFFICIAL RECORDS.
    Dated:                      JULY 12, 2010
    Trustor:                    CHARLES L. DUFF, ALSO KNOWN AS CHARLES DUFF, AND
                                CATHRYN A. DUFF, ALSO KNOWN AS CATHRYN ALICE
                                DUFF, HUSBAND AND WIFE
    Trustee:                    LANDAMERICA GATEWAY TITLE
    Beneficiary:                THE ADMINISTRATOR OF THE U.S. SMALL BUSINESS
                                ADMINISTRATION, AN AGENCY OF THE GOVERNMENT OF
                                THE UNITED STATES OF AMERICA

    A document recorded OCTOBER 07, 2010 as INSTRUMENT NO. 10-56044 OF OFFICIAL RECORDS
    provides that the deed of trust or the obligation secured thereby has been modified.

    A document recorded MAY 10, 2011 as INSTRUMENT NO. 11-27790 OF OFFICIAL RECORDS provides
    that the deed of trust or the obligation secured thereby has been modified.

9.  Proceedings pending in the Bankruptcy Court of the CENTRAL District of the U.S. District Court,
    California, entitled in re: CHARLES L. DUFF, debtor, Case No. 9:18-BK-11889-DS, wherein a petition
    for relief was filed under Chapter 7 AND PREVIOUS/ORIGINAL CHAPTER 11  on  NOVEMBER 12,
    2018.

10. Rights of the public in and to that portion of the Land lying within any Road, Street, Alley or Highway.

11. Water rights, claims or title to water, whether or not shown by the Public Records.

Order Number:  4001-6885270
Page Number:  6

| INFORMATIONAL NOTES |
|---|

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

1.    General and special taxes and assessments for the fiscal year 2021-2022.

| | |
|---|---|
| First Installment: | $4,656.93, PAID |
| Penalty: | $0.00 |
| Second Installment: | $4,656.93, PAID |
| Penalty: | $0.00 |
| Tax Rate Area: | 86-006 |
| A. P. No.: | 021-020-005 |

2.    This report is preparatory to the issuance of an ALTA Loan Policy. We have no knowledge of any fact which would preclude the issuance of the policy with CLTA endorsement forms 100 and 116 and if applicable, 115 and 116.2 attached.

When issued, the CLTA endorsement form 116 or 116.2, if applicable will reference a(n) Single Family Residence  known as 2690 GIBRALTAR ROAD, SANTA BARBARA, CA.

3.    According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

None

NOTE to proposed insured lender only: No Private transfer fee covenant, as defined in Federal Housing Finance Agency Final Rule 12 CFR Part 1228, that was created and first appears in the Public Records on or after February 8, 2011, encumbers the Title except as follows: None

The map attached, if any, may or may not be a survey of the land depicted hereon. First American expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

Order Number: 4001-6885270
Page Number: 7

LEGAL DESCRIPTION

Real property in the unincorporated area of the County of Santa Barbara, State of California, described as follows:

THE NORTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 2, TOWNSHIP 4 NORTH, RANGE 27 WEST SAN BERNARDINO BASE AND MERIDIAN IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND FILED IN THE DISTRICT LAND OFFICE MAY 21, 1875.

EXCEPTING THEREFROM THOSE PORTIONS THEREOF CONVEYED TO FREDHIL CO., A CALIFORNIA CORPORATION, BY CORPORATION QUITCLAIM DEED RECORDED SEPTEMBER 11, 1973, AS INSTRUMENT NO. 36203, IN BOOK 2480, PAGE 1318, OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND ALL MINERALS, LYING 500 FEET OR MORE BELOW THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF ENTRY UPON THE SURFACE OF SAID LAND OR ANY PART THEREOF, AS RESERVED BY UNIVERSITY OIL CORPORATION, IN DEED RECORDED OCTOBER 27, 1976, AS INSTRUMENT NO. 46075, IN BOOK 2631, PAGE 2096, OF OFFICIAL RECORDS.

APN: 021-020-005

Order Number: 4001-6885270
Page Number: 8



Order Number:  4001-6885270
Page Number:  9

*NOTICE*

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

Order Number: 4001-6885270
Page Number: 10

EXHIBIT A
LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (BY POLICY TYPE)

### CLTA STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.   (a)  Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land: (ii) the character, dimensions or location of any improvement now or hereafter erected on the land: (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part: or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

    (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant:

    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy:

    (c)  resulting in no loss or damage to the insured claimant:

    (d)  attaching or created subsequent to Date of Policy: or

    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims: (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof: (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.

### CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a.  building:

*First American Title*
Page 10 of 14

Exhibit 2                                        Page 49

Order Number:  4001-6885270
Page Number:  11

    b.  zoning;
    c.  land use;
    d.  improvements on the Land;
    e.  land division; and
    f.  environmental protection.
    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2.    The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3.    The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4.    Risks:
    a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c.  that result in no loss to You; or
    d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5.    Failure to pay value for Your Title.
6.    Lack of a right:
    a.  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.  in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.    The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.    Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.    Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.


## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $10,000 |
| Covered Risk 18: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 19: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 21: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $5,000 |


## 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.    (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

        (i) the occupancy, use, or enjoyment of the Land;
        (ii) the character, dimensions, or location of any improvement erected on the Land;
        (iii) the subdivision of land; or
        (iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.    Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

Order Number: 4001-6885270
Page Number: 12

3.   Defects, liens, encumbrances, adverse claims, or other matters
     (a) created, suffered, assumed, or agreed to by the Insured Claimant;
     (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
     (c) resulting in no loss or damage to the Insured Claimant;
     (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
     (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
     (a) a fraudulent conveyance or fraudulent transfer, or
     (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).


The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

[Except as provided in Schedule B - Part II,[ t[or T]his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

### [PART I

[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:
1.   (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records: (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.   Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.
3.   Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.   Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.   (a) Unpatented mining claims: (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof: (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.   Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.


### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss

or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]


### 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.   (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

     (i) the occupancy, use, or enjoyment of the Land:
     (ii) the character, dimensions, or location of any improvement erected on the Land:
     (iii) the subdivision of land: or
     (iv) environmental protection:

     or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

Order Number:  4001-6885270
Page Number:  13

(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant:
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy:
    (c) resulting in no loss or damage to the Insured Claimant:
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 or 10): or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.


The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:


EXCEPTIONS FROM COVERAGE


This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:


1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records: (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) Unpatented mining claims: (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof: (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

7.  [Variable exceptions such as taxes, easements, CC&R's, etc. shown here.]


ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)
EXCLUSIONS FROM COVERAGE


The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:


1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land:
    (ii) the character, dimensions, or location of any improvement erected on the Land:
    (iii) the subdivision of land: or
    (iv) environmental protection:

    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant:
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy:
    (c) resulting in no loss or damage to the Insured Claimant:
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11,

Order Number:  4001-6885270
Page Number:  14

16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28): or

(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

(a) a fraudulent conveyance or fraudulent transfer, or

(b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

Exhibit 3

**A&A ESCROW SERVICES, INC.**

15250 Ventura Blvd, Suite 715
Sherman Oaks, CA 91403

Phone:  (310) 550-6055
Fax:  (310) 550-6130

Antonia Delgado                                      Date:November 4, 2022
Sr. Escrow Officer                                   Escrow No.:          105615-AA

Property Address:        2690 Gibraltar Road,  Santa Barbara, CA  93105

### INSTRUCTIONS TO PAY COMMISSION

At the close of your above-numbered escrow, you are authorized and instructed to pay the following:

| | | |
|---|---|---|
| Pay Commission to | Coldwell Banker<br>1608 Montana Ave.<br>Santa Monica, CA  90403<br>Agent:  Bill Friedman | $25,147.50 |
| Pay Commission to | Compass<br>801 Chapala St.<br>Santa Barbara, CA  93101<br>Agent:  Stan Tabler | $25,147.50 |
| Pay Commission to | Berkshire Hathaway<br>HomeServices<br>1170 Coast Village Road<br>Montecito, CA  93108<br>Agent:   Dan Johnson | $57,480.00 |

*Commission based on 2.400% of the sales price.

TOTAL COMMISSION 4.5%                                               $107,775.00

This instruction  irrevocably assigns  the above stated commission to the above named Broker(s).  This instruction may not be amended or revoked without the written consent of the Broker(s) hereinabove named.

**SELLERS:**

Bankruptcy Estate of Charles L. Duff, Bankruptcy
Case No. 9:18-BK-11889-DS


By: _____
        Jeremy W. Faith, solely in his capacity as
        Chapter 7 Trustee

Exhibit 3                                                           Page 54

Page 2

Date: November 4, 2022                                        Escrow No.:  105615-AA

**BROKERS:**

Coldwell Banker                              Berkshire Hathaway HomeServices


BY:_____          BY:_____
                Authorized Signature                          Authorized Signature
License #00616212_____              License #01317331_____


Compass


BY:_____
                Authorized Signature
License #01991628_____

Exhibit 3                                                         Page 55

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:16030 Ventura Blvd., Suite 470, Encino, CA 91436

A true and correct copy of the foregoing document entitled **CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF ORDER: (1) AUTHORIZING THE SALE OF REAL PROPERTY LOCATED AT 2690 GIBRALTAR ROAD, SANTA BARBARA, CA 93105, FREE AND CLEAR OF LIENS AND INTERESTS; (2) APPROVING OVERBID PROCEDURES; (3) APPROVING PURCHASER, SUCCESSFUL BIDDER, AND BACK-UP BIDDER AS GOOD FAITH PURCHASERS; (4) AUTHORIZING PAYMENT OF UNDISPUTED LIENS, REAL ESTATE BROKER'S COMMISSION, AND ORDINARY COSTS OF SALE; AND (5) WAIVING THE 14 DAY STAY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 15, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **November 15, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE:** Hon. Deborah J. Saltzman, U.S. Bankruptcy Court, 255 E. Temple St., Ste. 1634, Los Angeles, CA 90012
**DEBTOR**: Charles L. Duff, P.O. Box 20003, Santa Barbara, CA 93120

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 15, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 15, 2022 | Helen Cardoza | /s/ Helen Cardoza |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## ADDITIONAL SERVICE INFORMATION:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

**ATTORNEY FOR TRUSTEE: Samuel Mushegh Boyamian**    samuel@marguliesfaithlaw.com,
angela@marguliesfaithlaw.com, helen@marguliesfaithlaw.com,vicky@marguliesfaithlaw.com
**ATTORNEY FOR INTERESTED PARTY: Paul R Burns**    paulburnslaw@gmail.com, paulburnslaw@hotmail.com
**ATTORNEY FOR CREDITOR: Greg P Campbell**    ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;
gcampbell@aldridgepite.com
**TRUSTEE: Jeremy W. Faith (TR)**    Trustee@MarguliesFaithlaw.com,
C118@ecfcbis.com;Helen@MarguliesFaithLaw.com;leedowding@gmail.com
**ATTORNEY FOR U.S. TRUSTEE: Brian David Fittipaldi**    brian.fittipaldi@usdoj.gov
**ATTORNEY FOR CREDITOR: Nichole Glowin**    bankruptcy@zbslaw.com, nglowin@ecf.courtdrive.com
**ATTORNEY FOR INTERESTED PARTY: Merdaud Jafarnia**    bknotice@mccarthyholthus.com,
mjafarnia@ecf.inforuptcy.com
**ATTORNEY FOR INTERESTED PARTY: Elliot G Johnson**    ejohnson@klinedinstlaw.com, adavis@klinedinstlaw.com
**ATTORNEY FOR INTERESTED PARTY: Payam Khodadadi**    pkhodadadi@mcguirewoods.com,
dkiker@mcguirewoods.com
**ATTORNEY FOR INTERESTED PARTY: Bradford Klein**    bklein@zbslaw.com, kbowers@zbslaw.com
**ATTORNEY FOR CREDITOR: Mark S Krause**    bankruptcy@zbslaw.com, mkrause@ecf.courtdrive.com
**ATTORNEY FOR TRUSTEE: Anna Landa**    Anna@MarguliesFaithlaw.com,Helen@MarguliesFaithLaw.com;
Vicky@MarguliesFaithLaw.com;Angela@MarguliesFaithLaw.com
**ATTORNEY FOR CREDITOR: Elan S Levey**    elan.levey@usdoj.gov, julie.morales@usdoj.gov
**ATTORNEY FOR CREDITOR: Erin M McCartney**    bankruptcy@zbslaw.com, emccartney@ecf.courtdrive.com
**ATTORNEY FOR CREDITOR: Austin P Nagel**    antwanette.hardin@bonialpc.com, Notices.Bonial@ecf.courtdrive.com
**ATTORNEY FOR INTERESTED PARTY: Ian A Rambarran**    irambarran@klinedinstlaw.com,
gosborne@klinedinstlaw.com;lsamson@klinedinstlaw.com
**ATTORNEY FOR CREDITOR: Arvind Nath Rawal**    arawal@aisinfo.com
**FORMER ATTORNEY FOR DEBTOR: Jeremy H Rothstein**    jrothstein@gblawllp.com,
nknadjian@gblawllp.com;msingleman@gblawllp.com
**ATTORNEY FOR TRUSTEE: Meghann A Triplett**    Meghann@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com
**United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov
**ATTORNEY FOR CREDITOR: Jennifer C Wong**    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.